IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 25, 2011 Session

## STATE OF TENNESSEE v. TIMOTHY EVANS AND MICHAEL DANIELS

**Direct Appeal from the Criminal Court for Hamilton County
Nos. 260094, 259788    Rebecca J. Stern, Judge**

**No. E2009-01627-CCA-R3-CD - Filed August 22, 2011**

A Hamilton County Criminal Court jury convicted the appellants, Timothy Evans and Michael Daniels, of first degree premeditated murder and conspiracy to commit first degree premeditated murder. In addition, the jury convicted Evans of carrying a dangerous weapon. After a sentencing hearing, the trial court sentenced Evans to concurrent sentences of life for the murder conviction, sixteen years for the conspiracy conviction, and thirty days for the carrying a dangerous weapon conviction. The trial court sentenced Daniels to consecutive sentences of life for the murder conviction and twenty-three years for the conspiracy conviction. On appeal, the appellants argue that (1) the evidence is insufficient to support the convictions, (2) the trial court erred by refusing to grant their motions to sever, (3) the trial court erred by using extreme and unnecessary security measures that prejudiced the jury against them, and (4) the trial court erred by failing to grant their motions for a new trial because the State's gang expert committed perjury. In addition, Daniels argues that (5) the trial court erred by failing to redact the indictments properly and (6) the trial court failed to control a witness adequately while the witness was testifying. Finally, the appellants contend that the cumulative effect of the errors warrants a new trial. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are
Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

John G. McDougal, Chattanooga, Tennessee, for the appellant, Timothy Evans, and Jesse W. Dalton, III, Chattanooga, Tennessee, for the appellant, Michael Daniels.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Blesdsoe, Assistant Attorney General; William H. Cox, District Attorney General; and Neal Pinkston, Assistant District

Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

This case relates to the shooting death of twenty-six-year-old Adrian "A.D." Patton on June 13, 2006, in Chattanooga.  At trial, Investigator Christina Young testified as an expert in gang activity that she worked for the Silverdale Detention Center as a gang investigator.  As part of her duties, she was responsible for identifying inmates with gang affiliations and managing those inmates.  She explained that gangs were a security threat for the detention center's employees and inmates not affiliated with gangs and that she interviewed every inmate within seventy-two hours of the inmate's arrival at the facility.  She described how gangs such as the Crips and Bloods originally formed in California and said the first documented Bloods gang was named the Piru Street Gang because the founder lived on Piru Street.  She said that members of the Bloods often used "Piru" as another word for "friend" and that the ranking structure within the Bloods was as follows, from highest rank to lowest: O.G., original gangster; Y.O.G., young original gangster; Y.G., young gangster; B.G., baby gangster for children eight to twelve years old; and soldiers, young aspiring gang members "out doing the majority of the work."  Investigator Young explained that "set gangs" were local versions of the large gangs and that the Skyline Bloods and East L Treetop Piru Bloods were Chattanooga set gangs under the Bloods.  She said that each gang usually claimed a particular area as its territory and that lower gang members wanted to impress their O.G.

On cross-examination, Investigator Young testified that the Skyline Bloods had about thirty-five members and that members used "Piru" as another word for "Blood."  She stated that a B.G. would do what he or she was told and that a Y.G. would have a small amount of status over a B.G. but still would have to answer to the O.G., who was the boss.  She said an O.G. gave orders to lower ranking members and usually did not participate in carrying out criminal activity.  If a gang member did not follow an O.G.'s orders, the member could be disciplined with punishment ranging from physical assault to death.

Officer Matthew A. Hennessy of the Chattanooga Police Department testified as a gang expert that he used to patrol "southside" Chattanooga, which encompassed the Emma Wheeler Homes housing development, Alton Park, St. Elmo, and Tiftonia.  He said the Skyline Bloods were in the southside area while the Crips and Gangster Disciples were in the East Lake Courts area.

On cross-examination, Officer Hennessy testified that the appellants were members

-2-

of the Skyline Bloods. He said that Evans was a B.G. in the gang and that it was his "understanding" from investigations and talking with gang members that appellant Daniels was a Y.G. He said O.G.s and Y.G.s were the "shot-callers" and could order that a lower-ranking gang member be fined, physically assaulted, ordered to harm a rival gang, shot, or killed if the member did not follow a leader's orders. He said that Delicia Woodruff, Frederico Brock, and Darius Sneed were "associates" of the Skyline Bloods and that he knew the victim to associate with the Crips-based gangs in East Lake Courts. Officer Hennessy said he thought Daniels was the current leader of the Skyline Bloods.

Officer Bryan Wood of the Chattanooga Police Department testified that on June 13, 2006, he was dispatched to a shots-fired call at a home in East Lake Courts and spoke with Daniels' sister, Nicole Evans.[1] Evans claimed that someone shot at her apartment building, damaging the bricks.

Frederico "Puerto Rico" Brock testified that he lived in an apartment on East 48th Street in the Emma Wheeler Homes housing development and grew up with the appellants, the victim, Delicia Woodruff, and Darius Sneed. He was not a gang member but associated with the Bloods, Crips, and Vice Lords. Brock said that about 3:00 p.m. on June 13, 2006, he was in "Rooster's" apartment, which was across the street from his own apartment, and that appellant Evans also was there. Evans was holding a black gun. About 5:00 p.m., the victim and Michael Hudgins arrived in a four-door Dodge Ram pickup truck and stopped on East 48th Street. The victim was sitting in the driver's seat, and Hudgins was sitting in the front passenger seat. Brock, Daniels, and Sneed went out to the truck. Brock was standing beside the front passenger-side door and was talking with Hudgins. Sneed and Daniels were standing beside the front driver-side door and were talking with the victim. At some point, Brock saw Evans standing toward the back of the truck on the driver's side. Woodruff was sitting on Brock's front porch. Brock said that Daniels told the victim, "I just thought you shot my sister's house up" and that the victim denied shooting the house. Sneed's and Daniels' conversation with the victim lasted ten or fifteen minutes, and Hudgins, Evans, and Woodruff were not involved. Brock said he heard Daniels tell Evans, "[H]andle it." Evans walked to the front of the truck and shot the victim eight or nine times. Brock said the truck "took off" and ran into a building down the street. Sneed, who was the victim's cousin, began hollering and crying, and some of the victim's uncles came outside. Daniels walked away.

Brock testified that Daniels and Evans were in the "Piru" gang but that he did not know their ranks. He said he had a drug problem and had spent all of his life in jail. He identified himself in photographs "[t]hrowing up a peace sign." He also identified

---

[1]Nicole Evans is not related to appellant Timothy Evans.

photographs of Daniels taken after the appellants' preliminary hearing, showing Daniels making a gang sign with his hands. Brock gave two statements to police, one on June 14 and one on June 20. He said that in his first statement, he denied being at the scene of the shooting because he did not want to be involved and labeled as a "rat." Brock was charged with crimes in this case and gave a second statement. Later, the charges against him were dismissed.

On cross-examination, Brock testified that he did not remember describing himself to police as "a slick mother fucker." He denied telling the police that while he and Evans were in Rooster's apartment, he saw Evans use a red bandana to load the gun. He said that he was "high" when he gave his first statement to police, that he used cocaine every day, and that "I stay high." He said that the truck's front passenger window was down at the time of the shooting but that he did not know if the truck's air conditioner was on. While Sneed and Daniels were talking with the victim, Brock saw Daniels leave the driver's side of the truck and walk toward the back of the truck to Evans. Brock said he stopped talking to Hudgins and listened to Daniels' and Evans' conversation because "instinct" told him something was about to happen. He said he heard Daniels tell Evans, "[H]andle that shit Piru." He acknowledged that he was the only person to hear Daniels make that statement. He said Evans walked to the driver's window and shot the victim from about one foot away. Brock said that he was talking to Hudgins just before the shooting and that he did not see Evans with a gun until Evans shot the victim.

Brock testified that he did not remember telling Sergeant Scott Bales that Daniels was the O.G. for the Skyline Bloods. He said, "The word is he is an O.G. I don't know for sure whether he is an O.G." When asked what would happen to a person who did not follow an O.G.'s order, Brock said, "Man, shit, they'd get killed. Something happen to them." He said that although he claimed in his June 20 statement to police that Daniels' gun was "showing" just before the shooting, Daniels did not have a gun. Brock said he was high when he gave his June 20 statement. He said he was not scared for himself but was scared for his family and children. He said that he had received threats but that "the truth is the truth."

Investigator Tracy McGhee of the Chattanooga Police Department testified that he went to the scene of the shooting and saw a truck that had crashed into an apartment. The State played a video recording of the crime scene for the jury while Investigator McGhee described the scene. The truck's doors were open.[2] Five bullet holes were in the truck: three in the driver's door, one in the door's window seal, and one in the passenger door behind the driver's door. Numerous bullet fragments were in the truck, including under the driver's

_____

[2]We note that in the video, the victim was still sitting in the driver's seat, and the windows on both front doors were down.

-4-

seat, inside the driver's door, and in the headliner above the passenger seat. A shell casing and a tooth were on the passenger-side front floorboard, and a second tooth was under the front passenger seat. Investigator McGhee saw gunshot wounds in the victim and blood on the steering wheel. Tire tracks were on East 48th Street, and the police found six nine millimeter shell casings on the street. They also found a black t-shirt and a Food Lion receipt behind an apartment. Investigator McGhee collected fingerprints from the truck. Later, the police placed dowel rods in the truck's bullet holes to track the trajectory of the bullets. A photograph of the dowel rods in the bullet holes shows the bullets were fired from outside the driver's door and into the direction of the driver.

On cross-examination, Investigator McGhee testified that the shell casing inside the truck was the same type as the six casings on the street. He did not notice any gun powder residue around the bullet holes that were in the truck's doors.

Investigator Ed Duke of the Chattanooga Police Department testified that he examined fingerprints recovered from the truck and compared them to known prints collected from the victim, the appellants, Michael Hudgins, Frederico Brock, Darius Sneed, and Delicia Woodruff. Sneed's palm print was on the driver's side of the truck bed. The victim's and Brock's fingerprints were on the front passenger door, and Evans' fingerprints were on the rear passenger door. On cross-examination, Investigator Duke acknowledged that Daniels' fingerprints were not identified on the truck.

Darius Sneed testified that he was the victim's first cousin and that he was affiliated with the Athens Park Bloods. He said that he did not "hang" with the victim but that they were close. He said that Daniels claimed to be the O.G. of the Skyline Bloods when Daniels was actually only a Y.G. and that Daniels gave Evans "some fake Y.G. status." On June 13, 2006, Frederico Brock telephoned Sneed and told Sneed that "something fixing to go on with your family. You need to get down here so you can make sure everything's straight." Sneed went to Emma Wheeler Homes and saw Daniels. Sneed telephoned the victim, and the victim came to East 48th Street. The victim and Michael Hudgins pulled up in a pickup truck. Brock stood at the passenger side of the truck while Sneed stood at the driver's door talking with the victim. Sneed said Daniels was standing with him but "strolled off to the back" where Evans was standing. Sneed said that he was talking with the victim and that "everything was cool" but that Evans suddenly "came around me shooting." He said he thought Evans had a "nine" and "unloaded the clip" while he yelled for Evans to stop. After the shooting, Sneed dropped to the ground and started crying while the truck pulled away. Sneed thought the victim was trying to get to a hospital but heard the truck crash. The victim's family came outside, and Evans and Daniels ran in different directions. Delicia Woodruff, who had not been standing by the truck, ran with Daniels. Sneed went to check on the victim, and the victim was alive.

Sneed testified that he saw Daniels holding a silver gun before the shooting but that he did not see Daniels shoot. He said that he did not hear Daniels say anything to Evans before the shooting but that Brock told Sneed, "[T]hat boy told dude to do that." He said he initially told the police that he was not present at the shooting because he was afraid the Skyline Bloods would retaliate against his family. The police charged him, Brock, and Woodruff with crimes in this case only because they would not tell the police what happened. Later, Sneed spoke with Lieutenant Edwin McPhearson and admitted being present. The charges against him were dropped.

On cross-examination, Sneed testified that the victim came to Emma Wheeler Homes on June 13 to talk with Daniels but that the victim was not looking for trouble and wanted to clear up misinformation about the shooting at Daniels' sister's house. Sneed said Timothy Sexton also might have been standing at the truck before the shooting but that he did not remember. Sneed said that he did not see Evans at the truck when Sneed first started talking with the victim but that Evans "popped up" at some point. Although Sneed did not hear Daniels tell Evans to kill the victim, Sneed said he knew Daniels gave the order because Evans did not even know the victim. About an hour after the shooting, Evans telephoned Sneed and told Sneed he was sorry for shooting the victim and did not know Sneed was the victim's cousin. Sneed asked Evans why he shot the victim, and Evans told Sneed that Daniels told him to do it. Sneed said Evans shot the victim because Daniels was "over" Evans, Evans was scared, and "something probably would have happened" to Evans if he had not carried out Daniels' order. Sneed said he did not think Evans would have shot the victim if Evans had known the victim was Sneed's cousin. He said that Daniels knew the victim was his cousin and that Daniels "did that shit behind my back." He said that he grew up with Brock and that Brock had no reason to lie about what Brock heard. Sneed said that he was probably high on June 13 but that "I still remember what happened. I bet you that."

Delicia "DeeDee" Woodruff testified that on June 13, she was living at the Hampton Inn on Rossville Boulevard. She was in her room with Sneed when Brock called and wanted to speak with Sneed. In response to Sneed's conversation with Brock, Sneed and Woodruff went to Emma Wheeler Homes. Sneed telephoned the victim and asked him to come over. Woodruff was sitting on Brock's porch when the victim pulled up, and Daniels, Sneed, Brock, and Timothy "Cocaine" Sexton went to the truck. Brock was standing at the passenger side, and the other three men were standing at the driver's side, talking with the victim. Evans, who was wearing a black t-shirt and shorts, arrived, and he and Daniels met at the bed of the truck. They had a brief conversation, and Evans pulled out a gun, wrapped it in a red rag, and started shooting. After the shooting, Woodruff ran. She said she lied to the police by telling them she did not know anything about the shooting because she was scared for her life.

On cross-examination, Woodruff testified that she and Sexton had been dating for two to three weeks at the time of the shooting and that Sexton was the O.G. of the Treetop Piru Bloods. Daniels had a rank in the Skyline Bloods. Woodruff did not know if he was the O.G., but Daniels' rank was higher than Evans' rank. Woodruff did not hear any of the appellants' conversation before the shooting and did not see Evans take off his black t-shirt after the shooting. She did not know why Evans shot the victim.

Michael "Flat Top" Hudgins testified that he was forty-nine years old and was not in a gang. He said that he knew the victim because the victim and Hudgins' son grew up together, that the victim was "just like my son," and that he saw the victim every other day. He did not know the appellants, Sneed, Brock, Sexton, or Woodruff. On June 13, the victim saw Hudgins walking down the street. The victim was driving a rented truck and picked up Hudgins. They were going to work on the victim's car. The victim received a telephone call from his mother, drove home, and went inside while Hudgins waited outside. Hudgins said that when the victim came outside about ten minutes later, the victim was mad and "was saying that his name came up in some kind of mess that happened out there in East Lake." The victim wanted to clear his name, and Hudgins rode around with him. The victim was talking on the telephone and drove to Emma Wheeler Homes. He stopped the truck on East 48th Street, and a couple of men walked up. Hudgins said, "Then the next thing I know the second guy came out with the pistol and started shooting." Hudgins ducked his head and heard eight to ten shots. He said that he looked at the victim, that the victim looked at him, and that the victim said, "Flat Top, do you believe this mother fuckin shit[?]" Hudgins said that the victim did not realize he had been shot and that Hudgins saw blood "shooting out his chest and stuff like somebody shooting a water hose." Hudgins said the truck was in gear and "took off" down the street at thirty to forty miles per hour. The truck jumped the curb, and Hudgins grabbed the steering wheel and steered the truck back onto the street. He put the truck in park and guided it into a tree to slow it down. It hit the wall of an apartment building, causing Hudgins to hit his head and knock out two of his teeth. The victim was dead, and Hudgins got out of the truck. When the police arrived, they asked him who shot the victim, and he told them he did not know.

On cross-examination, Hudgins testified that at the time of the shooting, the front passenger door window was up, no one was standing at the door, and he was not talking to anyone. He said the driver's door window was down, and he acknowledged that several people were standing at the driver's door. He said that it was hot outside and that the truck's air conditioner was on. He and the victim had been parked on East 48th Street for one to one and one-half minutes when the shooting started, and he did not hear anyone say, "[H]andle that shit."

Lieutenant Edwin McPhearson of the Chattanooga Police Department testified that he knew Michael "Mike Mike" Daniels from "working the streets" and could recognize Daniels' face and voice. Sometime after the shooting, Lieutenant McPhearson was speaking with Daniels' sister, Nicole Evans, at the police department. He received a call from the clerk in the front lobby, went to the lobby, and encountered Daniels' other sister, Shenika. She told Lieutenant McPhearson that she had Daniels on the telephone. Lieutenant McPhearson talked with Daniels and told Daniels that he needed to speak with Daniels about the investigation. He said Daniels told him, "I know who the fuck you are." Lieutenant McPhearson told Daniels that people might stop retaliating against Daniels' family if Daniels turned himself in. He said Daniels told him, "I have a hundred soldiers standing behind me. Do your job. It's your job to find me. You come and find me." Daniels also told him, "You know who I am. I'm a killer. Do your job." A few hours later, police officers located Daniels at an apartment in Emma Wheeler Homes. The SWAT team surrounded the apartment, and Daniels spoke with Lieutenant McPhearson on the telephone again. Lieutenant McPhearson said Daniels was "humble" and asked that he not be killed. Daniels surrendered to police and came out of the apartment. Lieutenant McPhearson said that as Daniels was being put into a patrol car, Daniels yelled to the crowd, "Skyline forever."

On cross-examination, Lieutenant McPhearson testified that Daniels did not have a gun on his person when the police arrested him. He said that Daniels "put [himself] at the forefront as being the head of the Skyline gang" and that Evans was either a B.G. or a soldier. He said that if gang members did not do as they were told, they could be physically punished or assigned to commit violent crimes.

Investigator Brian Lockhart of the Chattanooga Police Department testified that he processed the residence where the police arrested Daniels. He found a fully loaded revolver underneath a mattress in one of the bedrooms.

Investigator James Tate of the Chattanooga Police Department testified that he investigated the case and interviewed Daniels on June 16. Daniels waived his rights and gave a recorded statement. The State played a redacted version of Daniels' statement for the jury, and Daniels said the following: On June 13, Daniels was in a hotel room with Woodruff and Sexton when he received a telephone call from Brock, telling him that the victim was at Emma Wheeler Homes. Daniels, Woodruff, and Sexton went to the housing development. Brock was standing outside his apartment, and the victim "pulled off." Brock telephoned the victim and told the victim to come back. Daniels said that when the victim returned, he asked the victim about the victim's shooting at Nicole Evans' house earlier in the day. Daniels said that the shooter had endangered the lives of his sister and nephew and that the victim "was trying to plead his case to me that he didn't shoot." Daniels said that Sneed was standing with him, that Sneed was listening to him and the victim talk, and that

Sneed was "trying to keep peace." Brock, Woodruff, and Sexton were not close to the truck. Daniels said he heard gunfire and stepped away from the truck while Sneed "stayed there crying." Investigator Tate asked Daniels, "What did you want to happen when [the victim] pulled up?" Daniels said, "I wanted him to get up on the stand and let me and him be on the same page. Cool. And he was pleading his life to me. And after that, sir, it was too late." Daniels told Investigator Tate that he did not have a gun at the shooting. He said that he was not the O.G. of the Skyline Bloods but that "I do got status." Later, he said that he was a Y.G. and that "my rank ain't high enough to kill, to get nobody killed."

Dan Carman, a special agent forensic scientist with the Tennessee Bureau of Investigation's Crime Laboratory, testified as an expert in firearms identification that he received a .38 Special Taurus revolver and a nine millimeter semi-automatic pistol for testing. Carman determined that the pistol was inoperable. He also received three bullets, seven cartridge cases, and bullet fragments. All of the cartridge cases were Winchester nine millimeter cases that had been fired from the same gun. Carman concluded that the three bullets were all fired through the same gun barrel. The bullet fragments had the same class characteristics as the bullets, but Carman could not say they came from the same gun. However, he determined that the bullets and cartridge cases were not fired from the nine millimeter pistol he examined.

Dr. Stacy Turner, a forensic pathologist who performed the victim's autopsy, testified that the victim had six gunshot wounds. Two entered the victim's left chest, one entered his left abdomen, one entered his pelvic area, and two entered his left arm. The bullets perforated the victim's ribs, heart, right lung, small intestine, liver, pelvic bone, and body muscle. Bleeding occurred in his chest and abdominal cavities. Dr. Turner said three of the victim's gunshot wounds, i.e., one to the left chest, the one to the left abdomen, and the one to the left pelvic area, probably caused immediate death.

Timothy "Timboo" Evans testified on his own behalf that he was seventeen years old on June 13, 2006, and was a member of the Skyline Bloods. Daniels started the Skyline Bloods in Chattanooga and was the leader. Evans was a soldier in the gang for about one year. He became a B.G., and Daniels gave him his current Y.G. rank. He said that he did everything Daniels told him to because "I have no choice" and that he would be punished if he did not do as he was told. On the day of the shooting, Evans went to a job interview at McDonalds. As he was leaving, he ran into Daniels, and Daniels told him to go to Emma Wheeler Homes. Evans took a gun with him because he did not want to leave it where he was staying and met Daniels. He had met the victim for the first time earlier in the day and did not have a problem with the victim.

Evans testified that he, Daniels, Brock, and Woodruff waited for the victim to arrive.

He said that he and Brock had smoked "weed" earlier but that Brock was in "stable condition." The victim arrived in the truck, and Sneed went to the truck and started a conversation with the victim. Evans said that Daniels also went to the truck and that "they started talking and having little words and stuff." Evans said he did not really listen to the men talking. He said Daniels came to the back of the truck and told him, "[H]andle this shit." Evans testified, "I looked at him like what. And he was like kill that nigger." Evans said Daniels was walking toward him and reaching for Daniels' gun, so Evans walked to the front of the truck and started shooting. He said that he had "no choice" and that he fired nine or ten shots until the gun was empty. He said that he could have refused to shoot the victim but that "it happened so fast." He said that after the shooting, his conscience was bothering him because he had killed a man for no reason and that he could not eat, sleep, or stop moving. He said that he told the police he did not shoot the victim and that he lied because he was scared. He said that in a previous incident, Daniels told him to shoot at "some East Lake fellows." However, Evans was about fifty yards away when he shot at the men and did not hit any of them. He apologized to the victim's family.

On cross-examination, Evans testified that he became a Y.G. by "how I carry myself," by getting to meetings on time, and by being loyal to Daniels. He acknowledged that he was holding a bandana while he was loading the gun at Rooster's house and said that he loaded the weapon "after I had talked to them and realized that something was going on." However, he also said he "hadn't expected nothing to happen." He said that when the victim's truck arrived, Daniels and Sneed walked up to the driver's side while he stayed toward the back of the truck. He said Daniels walked toward him and told him, "[H]andle this shit Piru." He walked to the front of the truck and started shooting but did not wrap the gun in a red rag. After the shooting, he ran. When asked if he would have killed the victim if he had known the victim was Sneed's cousin, he said, "I really can't say."

Evans acknowledged that his attorney gave him a copy of Brock's statement and that he knew Brock was going to say Brock heard Daniels tell Evans to "handle that shit Piru." He acknowledged that he was not afraid of Daniels but said that he would kill for Daniels because he was loyal to Daniels. He said that he told the police Daniels killed the victim and that he blamed Daniels because he was afraid to admit he had killed someone. He said that he used the bandana to load the gun at Rooster's house because he did not want to get fingerprints on the bullets. However, he did not know he was going to shoot and kill anyone. He said the victim's death was not planned.

Although both of the appellants had been charged with first degree premeditated murder, conspiracy to commit first degree murder, and carrying a dangerous weapon, the jury found Daniels guilty only of the first two offenses. The jury convicted Evans as charged.

## II.  Analysis

### A.  Sufficiency of the Evidence

The appellants contend that the evidence is insufficient to support their convictions for first degree premeditated murder and conspiracy to commit first degree premeditated murder.  Specifically, Evans claims that the evidence is insufficient because the proof shows the victim's death was not planned and occurred suddenly.  In other words, the proof does not show that he premeditated killing the victim.  Daniels claims that the evidence is insufficient to support the convictions because the proof does not exclude the hypothesis that Evans acted alone.  The State claims that the evidence is sufficient.  We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e).  The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.  See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact.  See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury.  See id.  Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1).  A premeditated killing is one "done after the exercise of reflection and judgment."  Tenn. Code Ann. § 39-13-202(d).  The element of premeditation is a question of fact for the jury.  State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003).  Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing.  Bland, 958 S.W.2d at 660.  In State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of

multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

Tenn. Code Ann. § 39-12-103(a).

Taken in the light most favorable to the State, the evidence shows that on June 13, 2006, Daniels believed the victim was responsible for shooting at Daniels' sister's house. Daniels, who was the O.G. of the Skyline Bloods, went to Emma Wheeler Homes and had Brock telephone the victim and tell the victim to come to the housing development. When the victim arrived, Sneed and Daniels went to the driver's side of the truck to speak with the victim while Brock went to the passenger side. At some point, Evans, a subordinate member of the Bloods who did not know the victim, arrived and stood at the truck bed. While Sneed was talking with the victim, Daniels left the driver's window, walked to Evans, and told Evans to "handle that shit Piru." Daniels showed his gun to Evans and ordered Evans to kill the victim. Evans pulled out his own gun, walked to the front of the truck, and fired nine or ten shots at the victim, striking him six times.

Although Evans claims that the shooting was not planned, the evidence shows otherwise. Sneed testified that on the afternoon of the shooting, Brock told him to come to Emma Wheeler Homes because something was about to happen to Sneed's family. Evans testified that he used a rag to load his gun and keep fingerprints off the bullets because he realized "something was going on." Brock testified that just before the shooting, he listened to the appellants' conversation because "instinct" told him something was about to happen. Their testimony, combined with the following facts, demonstrate premeditation: (1) Daniels had a motive to retaliate against the victim for shooting at his sister's house; (2) the appellants procured weapons; (3) Evans used a deadly weapon upon the unarmed victim; (4) Evans cruelly shot the unarmed victim in the upper body repeatedly when the victim had come to the housing development only to speak with Daniels and clear his name; (5) Evans shot the victim multiple times; (6) Evans prepared before the killing to conceal the crime by

using the bandana to load the gun and by wrapping the gun in a red rag; and (7) the appellants attempted to conceal the crime by fleeing from the scene and denying their involvement to the police. Arguably, Evans' distress after the killing weighs against a finding of premeditation. However, in the light most favorable to the State, Evans was distraught about killing the victim because he had learned the victim was Sneed's cousin, not because he had shot an innocent person. The evidence is more than sufficient to show that both of the appellants premeditated killing the victim.

Regarding Daniels' claim that Evans acted alone, Brock testified that he heard Daniels tell Evans to "handle it," and Evans testified that Daniels told him to kill the victim. The jury, as was its prerogative, chose to accredit the testimony of the State's witnesses. We conclude that the evidence is sufficient to show that Daniels conspired with Evans to kill the victim.

## B. Severance

The appellants argue that the trial court erred by refusing to grant their motions for severance because their defenses were antagonistic and because security concerns warranted separate trials. The State contends that the trial court properly refused to grant the appellants' severance motions. We conclude that the appellants are not entitled to relief.

The grand jury indicted the appellants separately, and the State filed a motion to consolidate their trials pursuant to Tennessee Rule of Criminal Procedure 8(c). At a hearing on the motion, the State informed the trial court that the appellants were not indicted together because the case for Evans, a juvenile, had to be transferred from juvenile court. The appellants objected to consolidation, arguing that a joint trial would violate Bruton v. United States, 391 U.S. 123 (1968). In addition, Evans argued that a separate trial was warranted because he might rely on a defense of duress. The trial court granted the State's motion, concluding that any potential Bruton problem could be cured by the State's choosing not to use the appellants' statements at trial or redacting the statements.

Subsequently, Daniels filed a motion to sever pursuant to Tennessee Rule of Criminal Procedure 14(c), arguing that separate trials were necessary because Evans' out-of-court-statements were inadmissible against Daniels and because the statements could not be redacted sufficiently to render them non-prejudicial. Daniels also argued that a joint trial could prejudice his ability to develop and present a defense and result in confusion of the issues. At the hearing on the motion, counsel for Evans argued that severance was necessary due to the appellants' different defenses, their not being able to be near each other in the courtroom, and counsel's fear of having to sit between them during the trial. Counsel for Daniels stated, "Security problems are also a great concern of mine, Your Honor." The trial

court denied the motion, reiterating that the State would have to comply with <u>Bruton</u> by not using the appellants' statements, redacting the statements, or trying the appellants separately. Although the trial court noted that it was concerned about security, it did not think safety concerns warranted separate trials. The court told the appellants that if they did not "sit there and behave" during the trial, they would be removed from the courtroom. The trial court denied their motions to sever.

Tennessee Rule of Criminal Procedure 8(c)(2) permits joinder of defendants in the same indictment when each defendant is charged with "conspiracy, and some of the defendants are also charged with one or more offenses alleged to be in furtherance of the conspiracy." Tennessee Rule of Criminal Procedure 14(c)(2)(A) provides that a trial court shall grant a severance of defendants before trial if "the court finds a severance necessary to protect a defendant's right to a speedy trial or appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Furthermore,

> [w]hile "mutually antagonistic" defenses may mandate severance in some circumstances, they are not prejudicial per se." <u>State v. Farmer, et al.</u>, No. 03C01-9206-CR-00196, 1993 Tenn. Crim. App. LEXIS 420 ([Knoxville,] July 8, 1993) citing <u>Zafiro v. United States</u>, 506 U.S. 534, 537-38, 113 S. Ct. 933, 937, 122 L. Ed. 2d 317 (1993). Due to the difficulty in establishing prejudice, relatively few convictions have been reversed for failure to sever on these grounds. <u>Id.</u> Mere attempts to cast the blame on the other will not, standing alone, justify a severance on the grounds that the respective defenses are antagonistic. <u>Id.</u> "The defendant must go further and establish that a joint trial will result in 'compelling prejudice,' against which the trial court cannot protect, so that a fair trial cannot be had." <u>Id.</u> quoting <u>United States v. Horton</u>, 705 F.2d 1414, 1417 (5th Cir. 1983).

<u>State v. Ensley</u>, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996). Whether to grant a severance lies within the sound discretion of the trial court. <u>State v. Meeks</u>, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993) (citing <u>State v. Coleman</u>, 619 S.W.2d 112, 116 (Tenn. 1981)). "This Court has held, '[w]here a motion for severance has been denied, the test to be applied in determining whether the trial court abused its discretion is whether the defendant was "clearly prejudiced" in his defense as a result of being tried with his co-defendant.'" <u>State v. Mickens</u>, 123 S.W.3d 355, 383 (Tenn. Crim. App. 2003) (quoting <u>State v. Price</u>, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000)). This court will not find an abuse of the trial court's discretion unless the record clearly shows that the defendant was so prejudiced by the

joint trial that the granting of a severance became a judicial duty. State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988).

The appellants contend that their defenses were not only mutually antagonistic but were mutually exclusive because the jury had to believe either Evans' defense of duress[3] or Daniels' defense that Evans acted alone. They also contend that the trial court's failure to order separate trials subjected the jury to prejudicial security measures and "theatrics" by the State. However, neither appellant has cited to any specific examples of how they were prejudiced by being tried jointly. Moreover, the evidence introduced against them at trial would have been admissible against them in separate trials, including Evans' testimony against Daniels. "[A] severance need not be granted where the evidence which was introduced could have been admitted against [the defendant] in a separate trial." State v. Little, 854 S.W.2d 643, 648 (Tenn. Crim. App. 1992). Therefore, we conclude that the trial court did not err by denying their motions to sever.

## C.  Security

Next, the appellants contend that the trial court erred by using "extreme and unnecessary" security measures that prejudiced the jury against them. As examples of the extreme and unnecessary measures, the appellants refer to the trial court's ordering extra metal detectors and armed security outside the courtroom doors, enhanced security at the entrances to the courthouse, the use of armed security to escort the jury to lunch and breaks, and the use of armed and uniformed officers to sit in the front row of the audience behind the appellants. However, as discussed above, counsel for both of the appellants stated that they were extremely concerned about safety and security in the courtroom. Moreover, as noted by the State, the appellants never objected to the extra security during the trial. Therefore, this issue has been waived. See Tenn. R. App. P. 36(b).

## D.  Gang Expert

The appellants contend that the trial court erred by denying their motions for a new trial because one of the State's experts, Christina Young, committed perjury. The State argues that the trial court properly denied the motions because nothing indicates Young's false testimony affected the jury's verdict. We agree with the State.

---

[3]We note that the opening statements, the closing arguments, and the trial court's jury instructions are not in the appellate record. Therefore, the record does not reflect that Evans formally argued a defense of duress pursuant to Tennessee Code Annotated section 39-11-504 or that the trial court instructed the jury on the defense.

At trial, Young testified for the State as an expert in gang investigations. During her testimony, she stated that she had an associate's degree in criminal justice and received some gang-related training while she was earning her degree. However, at the motion for new trial hearing, Young testified that she never received her degree and that she was no longer working for Silverdale Detention Center due to some "medical issues." She said that despite not having a college degree, "I felt like that my training would have qualified me on its own." In denying the appellants' motions for a new trial, the trial court stated that it was "appalled" Young lied about her credentials. However, the court ruled that it would have found Young to be an expert even if she had not testified about having a college degree. The trial court stated that it believed the rest of Young's trial testimony and noted that none of Young's testimony dealt specifically with the appellants. The trial court held that Young's perjury did not prejudice the appellants.

The appellants contend that Young's perjured testimony constitutes newly discovered evidence.

> The test for granting a new trial in cases involving recanted testimony as newly discovered evidence is based on the following criteria: A new trial may be granted because of recanted testimony when (1) the trial judge is reasonably well-satisfied that the testimony given by a material witness was false and that the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, was surprised by false testimony, or was unable to know of the falsity until after the trial; and (3) the jury might have reached a different conclusion had the truth been told. State v. Housler, 193 S.W.3d 476, 494 (Tenn. 2006) (citing State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999)).

State v. Tony Lee Crowe, No. M2009-02194-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 591, at *22-23 (Nashville, July 16, 2010). "The decision as to whether to grant a motion for new trial on the basis of newly discovered evidence lies within the sound discretion of the trial court." Id. at *23.

In this case, the third prong of the test has not been satisfied because the trial court found that Young's false testimony did not affect the jury's verdict. We agree. Young truthfully testified at trial that she had "141 gang investigator school hours that are post-certified, police officer standardized training certifications," that she obtained her gang specialist certification in 2002, that she was certified in tattoo interpretation and graffiti deciphering, and that she had attended numerous anti-gang seminars and training. The trial

court said that it would have found Young to be an expert even if she had not testified about having a college degree. We note that Officer Matt Hennessy, who also testified for the State as a gang expert, stated on cross-examination that he knew Young "through doing gang investigations" and acknowledged that she was knowledgeable about gangs. We conclude that Young's false testimony about having a college degree did not affect the jury's verdict. Therefore, the appellants are not entitled to relief on this issue.

### E. Conspiracy Indictments

Daniels contends that the trial court erred by failing to redact the indictments properly. The State argues that the trial court properly redacted the indictments. We conclude that the appellant has waived this issue.

Daniels' original indictment for conspiracy to commit first degree premeditated murder listed eighteen paragraphs describing overt acts to support the charge. Daniels filed a pretrial motion, requesting that the trial court dismiss the indictment because it was written to inflame the jury. In the alternative, the appellant requested that the trial court redact ten of the paragraphs. At a hearing on the motion, the trial court announced that it was going to sustain the motion "in a very limited way . . . and take out a little bit for the purposes of just the indictment." The trial court redacted (1) all but the first sentence in the first paragraph, (2) five words in the second paragraph, (3) the last sentence in the eleventh paragraph, and (4) the last four words in the eighteenth paragraph.[4] The trial court ruled that each of the remaining paragraphs properly described an overt act in furtherance of the conspiracy and would not be redacted.

The appellant contends that the trial court erred because twelve of the listed acts "in no way qualify as overt acts for the purpose of a conspiracy and were clearly designed to entice fear and bias within the jury." However, as noted by Daniels, a redacted version of the indictment is not in the appellate record. Moreover, a transcript of the indictments as read to the jury also has not been included in the record. Therefore, this issue is waived. Tenn. R. App. P. 36(a).

### F. Failure to Control Witness Sneed

Daniels contends that the trial court erred by allowing Darius Sneed continually to make "ugly, snide, prejudicial" comments to him in front of the jury. Daniels argues that

---

[4]Evans' indictment for conspiracy was identical to Daniels' indictment. Although Evans did not argue that his indictment also should be redacted, the trial court stated that its ruling would apply to the conspiracy indictments for both appellants.

Sneed's conduct was extremely prejudicial because Sneed repeatedly "taunted, challenged, threatened, and berated" him.  The State argues that the appellant has waived this issue because he failed to object at trial and that, in any event, nothing indicates Daniels was prejudiced by Sneed's outbursts.  We agree with the State.

Our review of Sneed's testimony reveals the following instances of inappropriate conduct during his direct testimony:

> [Sneed]: Boy, you a sucker, boy.  You is a bitch, boy.

> [The State]: Don't say that, Mr. Sneed.

> [Sneed]: Hey, man for real.  Man, you go and tell that boy to do that thing, you know, like first one snitch on the man now that ain't right.  That ain't right right there.  For real, man.

> [The State]: I understand.  But listen to me just a second.  Again, just talk to me or one of the attorneys.  Okay?  The questions -- I understand it's emotional, but it helps out everybody.

> . . . .

> [Sneed]: What you smiling like this shit funny, boy.  This shit ain't funny, boy.  For real, boy, this shit ain't funny.

> THE COURT: Mr. Sneed.

> [Sneed]: For real, man.  Dude keep smiling at me, and my cousin dead.  Boy, this ain't funny, boy.

> [The State]: Mr. Sneed --

> [Sneed]: Have some remorse boy.  (Unintelligible) got them (Unintelligible) boys looking at your punk-ass, boy.  Suck-ass, man, for real, man.

> [The State]: I understand.

> THE COURT: Mr. Sneed, if you want to help your

-18-

cousin's case, you're not doing that right now, so calm down. Okay?

[Sneed]: Smiling at me, boy. For real. Nigger, I want you to beat this case, nigger. For real, I want you to beat this case.

[The State]: Mr. Sneed, will you hush for just a second, please.

[Sneed]: Boy.

[The State]: Would you hush for just a second. I know this is emotional. You would agree with me --

[Sneed]: I want you to get out, boy.

[The State]: Would you look at me for a few minutes, please.

[Sneed]: F'ing keep smiling at me, man, like this funny.

[The State]: Look at me. Okay? All right? Can you look at me for a few minutes? Can you do that?

[Sneed]: (Witness moves head up and down.)

On cross-examination, Sneed argued with Daniels' attorney, asking him, "What wrong with you[?]" and stating, "Hey, man, I ain't trying to hear nothing you got to say." The following exchange also occurred between Sneed and Daniels' attorney:

[Sneed]: That dude, he ain't got no name for hisself, man. He ain't no David Barrows or -- you ain't fixin to make no name for yourself trying to beat this case for dude, man. For real, you're going to be a nobody man, like you been, man.

THE COURT: Mr. Sneed, we're going to move to a different subject. Okay?

[Sneed]: For real, man.

-19-

[Daniels' attorney]: We're going to move on, Mr. Sneed.

THE COURT: All right, move on.

[Sneed]: Ehhh, man.

Finally, the following exchanges occurred:

[Sneed]: Boy, I want to you beat this case. Boy, so help me, God, man. For real, (Unintelligible).

[Daniels' attorney]: Your Honor.

THE COURT: Mr. Sneed, come on. Okay? You're not helping.

. . . .

[Sneed]: You know, quit playing, (Unintelligible). But you (Unintelligible) wanted to be a O.G., nigger, take the charge. What the fuck wrong with you.

[Daniels' attorney]: Mr. Sneed.

[Sneed]: For real, man.

. . . .

[Daniels' attorney]: Mr. Sneed. You're not helping your cousin. You're not helping anybody.

[Sneed]: Man, I am helping my cousin. I'm here for him. What the hell. Shit. And, (Unintelligible) that's the fact I won't be on this stand.

THE COURT: [Defense counsel], it's getting a little long and argumentative. Can you wrap it up pretty soon, please.

[Daniels' attorney]: Yes, Your Honor. If you'll give me just a couple of minutes, I'm going to wrap it up.

[Sneed]: Just straight talking about nonsense, man, he's just trying to find something to help dude.

We are puzzled as to why the trial court allowed the witness repeatedly to address Daniels, use profane and inflammatory language, and show disrespect to counsel for both the State and the defense. As this court has stated,

> The trial court has a deep responsibility for the orderly and dignified conduct of courtroom proceedings. When the circumstances are those which may imprison a criminal defendant, the tension of the court room drama and the human frailties and emotional factors inevitably involved serve to make the judge's task more difficult. Order and decorum must be maintained. The factual inquiry must be conducted within the issues and at all times under the applicable rules of law.

State v. Land, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000); see also State v. Conway Fuqua, C.C.A. No. 1178, 1991 Tenn. Crim. App. LEXIS 666, at *13 (Knoxville, Aug. 28, 1991) (providing that "the trial court has the inherent power to preserve order in the courtroom, to protect the rights of the parties, and to further the interests of justice"). In any event, defense counsel never objected to Sneed's conduct or requested a mistrial. Furthermore, Sneed's comments demonstrate that some of them were precipitated by Daniels' smiling at him, and nothing in the record indicates that defense counsel attempted to control the behavior of his own client. Therefore, this issue is waived. See Tenn. R. App. P. 36(a).

The appellant contends that he was so prejudiced by Sneed's conduct that it would be "unconscionable" for this court to find that his right to a fair trial was not violated. However, the trial court, the prosecutor, and defense counsel warned Sneed that his behavior was hurting his credibility and the State's case. Given that defense counsel very well could have made a tactical decision not to object to Sneed's inappropriate comments, the appellant is not entitled to relief. See Tenn. R. App. P. 36(b); State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (providing that this court should not address an issue as plain error unless the five factors required for plain error relief have been established, including that "the accused did not waive the issue for tactical reasons").

## G. Cumulative Errors

Finally, the appellants contend that the trial court's cumulative errors warrant a new trial. However, not finding any errors in this case, this claim has no merit.

## III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE